Paul Eugene **TESSIER**

v.

**UNITED STATES of America.**

**Civ. A. 55–1052.**

United States District Court
D. Massachusetts.

June 9, 1958.

See also 156 F.Supp. 32.

John J. McHugh, Waltham, Mass.,
Robert D. Kilmarx, Boston, Mass., for
plaintiff.

George C. Caner, Jr., Asst. U. S. Atty.,
Boston, Mass., for the United States.

ALDRICH, District Judge.

This is an action under the F.T.
C.A., 28 U.S.C.A. § 1346(b), for, in ef-
fect, malpractice by doctors employed by
the Veterans Administration Hospital at
Togus, Maine. The government raises
at the outset the defense that it cannot be
liable because an ordinary public charita-
ble hospital would not be under similar
circumstances. I accept the govern-
ment's premise, Jensen v. Maine Eye &
Ear Infirmary, 107 Me. 408, 78 A. 898, 33
L.R.A.,N.S., 141; Powers v. Massachu-
setts Homeopathic Hospital, 1 Cir., 109
F. 294, 65 L.R.A. 372, certiorari denied
183 U.S. 695, 22 S.Ct. 932, 46 L.Ed. 394,
but disagree with its conclusion. The
statute permits suits against the govern-
ment "under circumstances where the
United States, *if a private person,* would
be liable to the claimant in accordance
with the law of the place where the act or
omission occurred." 28 U.S.C.A. § 1346
(b). (Italics supplied.) This is a waiv-
er of tort immunity. It would be illogical
to read back into the statute an immunity
which has been granted to local charities,
presumably for the pragmatic purpose
of extending the charitable dollar to the
greatest good of the greatest number,
comparable in many respects to ordinary
governmental immunity. While the
court avoided this question in Porto
Rico Gas & Coke Co. v. Frank Rullan &
Associates, 1 Cir., 189 F.2d 397, 401, its
affirmance in United States v. Grigalaus-
kas, 1 Cir., 195 F.2d 494, of the District
Court, though without discussion, neces-
sarily involved such a ruling.

■ Turning to the merits, the plaintiff for some years prior to 1954 had been suffering from general malaise and recurrent pain in the right quadrant at the base of the chest. He had been hospitalized at Veterans Administration hospitals, sometimes for weeks at a time, and while pleurisy and other matters were suspected, nothing was definitely established. In February, 1954 the symptoms returned and on the twenty-second he entered the hospital at Togus. He was suffering a mild fever and poorly localized sub-acute pains in the region of the diaphragm, and appeared chronically ill. No purpose will be served in detailing his exact hospital course, but for five weeks he underwent a large variety of tests and medication, some more or less painful and upsetting. About half of the time he was in bed. X-ray and fluoroscopic examinations were had on a number of occasions, and all reported normal. In point of fact there appeared on many plates two metallic needle fragments between plaintiff's diaphragm and his liver. On any one plate these might well not be observed because they looked exactly like artifacts, thin white lines which are a common X-ray anomaly, and even on a series of plates they could be overlooked. They were discovered on March 31, on a review of all plates taken through March 11. I find, however, they should have been noted by March 12.[1]

As a result of this discovery exploration was initiated forthwith by needle and it was ascertained that the plaintiff had a subdiaphragmatic abscess. This abscess was in the general region of a possible liver abscess, previously suspected, but not the same thing. It is quite uncommon. Also, it is not usual to associate it with foreign bodies. It was not the fragments which were giving the pain, but the abscess. There was no sufficient reason from plaintiff's symptoms to suspect originally the presence of either condition. There was evidence that because of its lack of objective characteristics the diagnosis of a subdiaphragmatic abscess normally consumes several weeks. Indeed, such abscess was specifically looked for fluoroscopically on March 18, and not discovered, and I would not regard that particular failure in itself negligent. But had the metallic fragments been sooner found, in the light of previous elimination of various more common diseases a special, more rigorous, localized investigation would have then led to the discovery of the abscess 19 days earlier.

■ Reviewing the plaintiff's condition and hospital course for the 19 days in question, I find damages, including lost earning capacity, in the amount of $650. Before his hospitalization plaintiff had been on 20% veterans' disability benefits, some of which was for the conditions due to his abscess. For his hospital stay he was allowed 100% disability, at the rate of $172.50 a month. For this the government is entitled to credit. Brooks v. United States, 337 U.S. 49, 53–54, 69 S.Ct. 918, 93 L.Ed. 1200; United States v. Gray, 10 Cir., 199 F.2d 239, 243–244; United States v. Brooks, 4 Cir., 176 F.2d 482. I find for the plaintiff in the net amount of $550.

1. In so holding I am not placing upon the government the burden of satisfying the top expertise available in outstanding centers like New York and Boston, but merely of ordinary average competency. No doubt the two radiologists then at Togus possessed such ability, but I find they divided the plaintiff's work between them, and did not adequately review his plates or attack his problem as a whole. His unusual and long-standing symptoms invited special, comprehensive consideration from the radiologists, and I find he received only routine.